BOUDIN, Circuit Judge.
Deborah Maher, a registered nurse, began work at Massachusetts General Hospital (“MGH”), in August 2001. Maher stopped working in November 2001 and, in February 2002, began receiving disability benefits through MGH’s long-term disability plan due to chronic abdominal pain and related symptoms.[1] Her physicians — although never “entirely clear” on the cause — attributed her symptoms to chronic pancreatitis, chronic pain syndrome or fibromyalgia. Over time, joint pain added to her woes, and Maher received “impressive amounts of narcotics” to manage her pain, which caused some negative side effects.
In February 2007, Liberty Life Assurance Company of Boston (“Liberty”), the plan’s claims processor, terminated Maher’s benefits. After a June 2007 letter misquoted plan language, Liberty concluded in a corrected September 2007 letter that Maher was no longer “totally disabled,” defined in Section 2.10 of the “The Massachusetts General Hospital Long Term Disability Plan” (the “primary plan document”) as
such complete incapacity, resulting from a medically determinable physical or mental impairment, as prevents the Participant from performing any and every duty of any occupation or employment, for which he is reasonably qualified by education, training or experience.
This determination was based in part on medical assessments more fully described below but also on covert surveillance video showing Maher driving, walking, jogging, bending over, flying a kite, and lifting her three-year-old child. The most comprehensive- assessment was by Dr. Robert Millstein, a medical consultant at Liberty, who based his judgment on review of Maher’s medical file. He confirmed diagnoses by Maher’s personal physicians of her fibromyalgia, osteoarthritis, and psoriasis but determined that none prevented Maher from working.
Maher pursued administrative appeals with Liberty and ultimately with Partners Healthcare System, Inc. (“Partners”), the plan’s administrator. She submitted supporting materials, most notably March 2007 statements from her personal physician, Dr. Elizabeth Cuevas, and Dr. Wolfram Goessling, her gastroenterologist. Dr. Cuevas represented that Maher, despite her pain medications, “remains in significant disability, both from her chronic pain and from the side effects the pain medication cause, such as somnolence. She is unable to reliably perform duties because her pain can become so severe so quickly.” And Dr. Goessling stated that “I do not see any way that my patient would be able to sit or stand for prolonged period[s] of time let alone do physically or intellectually demanding work.”
*291 During the ensuing appeals, new doctors independently reviewed Maher’s files. Dr. Herbert Malinoff, conducting the independent assessment on Maher’s appeal within Liberty, consulted with Dr. Cuevas and Dr. Goessling, but ultimately found Maher’s symptoms “far out of proportion to any abnormality identified physically”; Dr. Dean Hashimoto, conducting the independent assessment on Maher’s final appeal to Partners, agreed disability had not been established. Broadly speaking, both, along with Dr. Millstein, believed that the physical data did not explain the degree of pain or other symptoms claimed by Maher and found she had provided insufficient other evidence of completely debilitating pain.
Partners formally denied Maher’s last appeal in January 2008. Maher sought review of her benefits termination in federal court under section 502 of the Employee Retirement Income Security Act (“ERISA”), 29 U.S.C. § 1132(a)(1)(B) (2006). The district court, reviewing the plan administrator’s decision under a deferential “arbitrary and capricious” standard, entered summary judgment for the MGH Plan and upheld the termination of benefits. Maher v. Mass. Gen. Hosp. Long Term Disability Plan, No. 08-10460 (D.Mass.Fed.23, 2010) (unpublished order). Maher has now appealed, challenging both the standard applied by the district court and the substantive decision.
The standard of review presents an issue of law which we review de novo, Smart v. Gillette Co. Long-Term Disability Plan, 70 F.3d 173, 178 (1st Cir.1995). The denial of benefits is itself subject to de novo review (albeit ordinarily on the administrative record) “unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan,” Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), in which event the court applies a deferential “arbitrary and capricious” or “abuse of discretion” standard, Cusson v. Liberty Life Assurance Co., 592 F.3d 215, 224 (1st Cir.2010).
Here, section 6.1 of the primary plan document unequivocally reserves to “the Hospital” authority “to determine eligibility for benefits, construe the terms and conditions of the Plan, and resolve disputes as to the interpretation of the Plan documents”; and it explicitly precludes review unless the Hospital’s action was “arbitrary and capricious or without rational basis.” The “Hospital” is defined only as “The General Hospital Corporation” (“GHC”), which is a Massachusetts charitable organization whose sole member is MGH, whose sole member, in turn, is Partners.[2]
Maher’s argument in favor of de novo review is that the final decision in this case was made by Partners; no proper delegation of authority to determine benefits was ever made to Partners; and therefore Partners’ decision to deny benefits is not protected by section 6.1’s deferential standard of review. It is clear enough that, absent a proper delegation, the MGH Plan could not rely on section 6.1’s standard to defend a denial by an independent entity. See Terry v. Bayer Corp., 145 F.3d 28, 37-38 (1st Cir.1998).
As it happens, GHC, MGH and Partners are in practice far from independent. Partners is a framework entity embracing MGH and Brigham — two of the major teaching hospitals in Boston — and includes *292 smaller nonprofit hospitals as well; the boards of directors overlap; and Partners appears to operate in part as a coordinating body that performs various functions for the member hospitals including, at least so far as the MGH Plan is concerned, administrator of the plan in question on behalf of “the Hospital.” We say “appears” because the MGH Plan has chosen to defend the case as one of conventional delegation.
This choice of litigation strategy lends a certain air of unreality to the situation. The affiliation may explain why some aspects of the alleged delegation are not as clearly formalized as one might expect. In the end, viewed as a conventional delegation — the MGH Plan has not relied on affiliation or provided detailed information about it — the treatment of Partners as a proper inheritor of “the Hospital’s” discretionary authority is justified, but perhaps only by a modest margin.
The double issue is whether the plan “expressly provide[s] for procedures” for GHC to designate Partners as a fiduciary with discretionary authority to administer the plan, 29 U.S.C. § 1105(c)(1); Terry, 145 F.3d at 36, and, if so, whether this had occurred. The courts have not been overly demanding in the search for express “procedures.” Wallace v. Johnson & Johnson, 585 F.3d 11, 15 (1st Cir.2009). The district court relied on section 6.3 of the primary plan document, which provides:
The Hospital may employ agents, including but not limited to, a Claims Processor, accountants, attorneys or actuaries to perform such services and duties in connection with the administration of the Plan as it may direct.... The Hospital shall be fully protected in acting upon the advice of any such agent, in whole or in part, and shall not be liable for any act or omission of any such agent, the Hospital’s only duty being to use reasonable care in the selection of any such agent.
Maher argues that the focus of this language is primarily on ancillary duties to aid GHC in carrying out its own responsibilities. Nothing expressly identifies decisional authority to determine benefits as a power that can be delegated. If a separate identification were required, that might be the end of any delegation claim, but under the case law it is enough that the language can be taken to include that delegation. E.g., Pettaway v. Teachers Ins. & Annuity Assoc., 644 F.3d 427, 434-35 (D.C.Cir.2011).
Section 6.3 can be read quite broadly: the list of agents GHC may employ is non-exhaustive, nothing limits the services and duties GHC may direct its agents to perform, and the attempt to relieve GHC of liability is consistent with an allocation of responsibilities from one fiduciary to another. See 29 C.F.R. § 2509.75-8, FR-14. Lawyers are commonly charged with fiduciary duties, and ERISA may in some circumstances treat accountants and actuaries as fiduciaries as well, despite merely providing “advice.” See 29 C.F.R. § 2509.75-5, D-1.
Here, any uncertainty is resolved by looking to associated documents including the trust agreement and the summary plan description, 29 U.S.C. § 1024(b)(4), which we are entitled to consult. Pettaway, 644 F.3d at 433-34. The summary plan description clearly states that “Partners acts as the Plan Administrator” of MGH’s long-term disability plan and “has the discretion to determine all matters relating to eligibility, coverage and benefits under each Plan provided.”[3] And, the *293 plan’s trust agreement contemplates certain actions being undertaken by GHC “or its delegate.”
Thus the plan instruments not only make clear that the plan authorized delegation of fiduciary responsibility to Partners, but also that such delegation actually occurred. Compare Rodriguez-Abreu v. Chase Manhattan Bank, N.A., 986 F.2d 580, 584 (1st Cir.1993) (documents taken together failed to delegate). Given that delegation, the denial will be upheld only “if it is reasoned and supported by substantial evidence.” Gannon v. Metro. Life Ins. Co., 360 F.3d 211, 213 (1st Cir.2004). Maher has the burden of proving her disability. Orndorf v. Paul Revere Life Ins. Co., 404 F.3d 510, 518-19 (1st Cir.), cert. denied, 546 U.S. 937, 126 S.Ct. 425, 163 L.Ed.2d 324 (2005).
Turning then to the denial of benefits, it is common ground that Maher suffers from significant medical afflictions and uses narcotics to combat pain. The question is whether Maher’s chronic pain and/or narcotics use render her incapable of performing the sedentary nursing jobs suggested by Liberty’s consultant in a “transferrable skills analysis” conducted during the review of Maher’s benefits; the jobs included full-time sedentary work as a telephonic triage nurse, nurse case manager, or utilization review nurse.
On Maher’s side we have diagnoses of medical ailments unchallenged by Partners and explicit statements, already quoted, by her own doctors who treated her — one of whom assessed “significant disability” and the other of whom said that she could not do “physically or intellectually demanding work.” These are, of course, fairly summary assessments; but the last, if fully credited and not contradicted by other evidence, might appear to rule out even the less physically demanding nurse-related positions suggested.
Yet these assessments of disability also depended on Maher’s self-reporting as to the effects of medication and, more importantly, the severity of her symptoms. Maher has been plagued — among other things — by pain, nausea, vomiting, and diarrhea. She has seen a host of doctors, attended pain clinics, been recurrently hospitalized, treated with high doses of narcotics, and undergone pancreatic and biliary sphincterotomies — surgical procedures designed to relieve pancreatitis.[4] So obviously she has serious symptoms; but the question remains whether they are disabling, and this brings us to the heart of the problem.
In some situations, the degree of pain or other dysfunction corresponds with what doctors knowing of the malady would expect or at least deem within range. Dr. Millstein clearly thought that this was not true here — detecting some signs of exaggeration and doctor shopping — and he concluded that any negative impact of the narcotics would be alleviated by adaptation to the dosages. He also relied on both the surveillance video and a number of other *294 separate pieces of evidence to which one might attach more or less weight:
-a September 2006 statement by Dr. Cuevas, Maher’s primary care physician, stating that she had not placed restriction on Maher for abdominal pain and was not aware of restrictions from other doctors;
-a November 2006 record from Dr. Anthony Reginato, a rheumatologist, indicating that Maher denied chills, vomiting, and abdominal pain, but also complained of having such pain over the previous 10 days; and
-documentation that Maher had not seen Dr. Wolfram Goessling, her gastroenterologist, during 2006.
Dr. Malinoff, who conducted the first independent assessment, found Maher’s symptoms “far out of proportion to any abnormality identified physically,” and again relied on Liberty’s video surveillance. Dr. Malinoff also consulted with Dr. Cuevas and Dr. Goessling. Dr. Malinoff highlighted Dr. Cuevas’ agreement that “there is no identifiable medical/internal medicine issue which would prevent this woman from carrying out sedentary or light labor on a full time basis,” and emphasized his disagreement with Dr. Goessling’s focus on Maher’s self-reported symptoms.
Dr. Hashimoto, conducting the last independent assessment, discredited Maher’s pain based on her failure to submit supporting evidence of disability from her treatment in pain clinics; emphasized Dr. Cuevas’ statement to Dr. Malinoff about Maher’s physicians’ inability to pinpoint an anatomic cause of her symptoms; discredited Dr. Goessling’s opinion due to his failure to treat Maher in 2006; and relied on the video surveillance of Maher. He also said that there was little evidence of either evaluation or treatment of her claims of impairment based on narcotics use.
This is a fairly impressive set of objections but there are two aspects that concern us and, taken together, warrant remand for further consideration.[5] The first, and most important, rests on the fact that at every stage of Maher’s administrative appeal, Liberty and Partners’ reviewing doctors emphasized the inconsistency between her self-reported limitations and the surveillance video. It is not apparent to us that any such inconsistency exists.
Maher reported that her activity varied based on the extent of her pain, nausea, and opportunity to pre-medicate for activities, but that she generally spent most of her days in bed. In over 90 hours of surveillance, the most damning evidence the MGH Plan can identify is 15 minutes during which Maher carried a bucket or flower pot and 30 minutes during which Maher played with her three-year-old son in the park. On 10 of the 19 days on which surveillance video is available, Maher engaged in no activity. On other days, Maher was shown sitting or standing outside her house with her husband for about 20 minutes.
Thus most of the surveillance, far from contradicting Maher’s disability, seems to confirm her lifestyle as generally housebound with occasional, limited activity. For the brief periods of slightly more vigorous activity, Maher may have pre-medicated or may have simply been having a “good day” — either of which would be consistent with her reported limitations. Of course, she may have been housebound by choice — that is the critical question. But *295 this is far from a situation in which a video conclusively disproves the disability claim.[6]
This court earlier upheld a termination of benefits where claimant’s credibility was called into question by sporadic surveillance capturing limited activity. Cusson v. Liberty Life Assurance Co., 592 F.3d 215, 228-30 (1st Cir.2010). But there the videos showed activities that specifically contradicted claims made by the claimant as to how she spent her time and what actions she could tolerate. Id. at 225. We cautioned in that case that weight given to surveillance in these sorts of cases depends both on the amount and nature of the activity observed. Id.
Apart from the video, the main objective fact relied on by Partners was Maher’s failure to provide supporting evidence of disability from her pain clinics. But Maher explained her attempts to obtain documentation from those clinics and offered both releases to allow the MGH Plan to access the information and to submit to examination by a doctor of the MGH Plan’s choosing. It also appears that two of the three pain clinics were MGH-affiliated so the information ought to have been accessible.
In the end, the MGH Plan was entitled to be skeptical: the claimant has a stake in the outcome; and the treating doctors do not purport to explain the degree of pain claimed. But the video evidence and failure to produce pain clinic information seem overstated. We cannot say with assurance that the MGH Plan denied Maher benefits to which she was entitled, but even according deference we are also not confident that its analysis has fully justified its decision.
The judgment of the district court is vacated and the matter remanded to the district court so it may allow Partners to conduct such further review and provide such further explanation and information as it sees fit, providing Maher a fair opportunity to respond to any such supplementation of the administrative record. We are not reinstating benefits but merely remanding to the plan administrator for further consideration of the claim and more adequate explanation, but we expect further proceedings by Partners to proceed with expedition. Each party to bear its own costs.

It is so ordered.

. We refer to the MGH Long-Term Disability Plan, technically the defendant in this case, as the "MGH Plan.” We refer to the plan documents and terms as "the plan.”

. “Member,” in this context, is more or less the same as controlling party. See 18A Am. Jur. 2d: Corporations § 633 (2011) ("[M]embers, while not usually denominated 'stockholders,' have an interest in the corporate property similar to that of stockholders in ordinary corporations.”).

. Maher argues that this document, titled "Partners Healthcare System, Inc.: Health *293 and Welfare Plan Document,” is not a Summary Plan Description for MGH's long-term disability plan because the document lacks certain information and identifies the plan as an insurance plan when it is in fact funded as a trust. But an MGH Plan affidavit confirms that the document is the Summary Plan Description, and the document itself describes Partners’ role in the administration of several benefits plans — MGH’s plan among them— and says that it, together with certain other materials, ”constitute[s] the summary plan description for each Plan.”

. Arguably Maher would not suffer such travails merely to strengthen the credibility of a disability claim or be able to fool so many doctors over so many years if there were little or no serious pain. See Carradine v. Barnhart, 360 F.3d 751, 755 (7th Cir.2004).

. See Buffonge v. Prudential Ins. Co., 426 F.3d 20, 31-32 (1st Cir.2005); Majeski v. Met. Life Ins. Co., 590 F.3d 478, 484 (7th Cir.2009); Leger v. Tribune Co. Long Term Disability Benefit Plan, 557 F.3d 823, 835 (7th Cir.2009).

. E.g., Oldrich v. Director, Office of Workers Comp. Programs, 141 F.3d 1178 (9th Cir.1998) (unpublished table op.) (claimant alleged disability due to shoulder injury but was seen chopping trees and participating in competitive swim meet); see also Tsoulas v. Liberty Life Assurance Co., 454 F.3d 69 (1st Cir.2006) (claimant reported complete inability to walk or stand without cane or wheelchair and never left house more than once per week, but surveillance video showed claimant walking without cane, going to the mall, and running other errands).