In the

# United States Court of Appeals

## For the Seventh Circuit

No. 10-1136

SUSAN MARANTZ,

*Plaintiff-Appellant*,

*v.*

PERMANENTE MEDICAL GROUP, INC.
LONG TERM DISABILITY PLAN and
LIFE INSURANCE COMPANY OF
NORTH AMERICA,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 1:06-cv-03051—**James F. Holderman,** *Chief Judge.*

ARGUED JANUARY 6, 2011—DECIDED JULY 10, 2012

Before EASTERBROOK, *Chief Judge*, and CUDAHY and
ROVNER, *Circuit Judges*.

ROVNER, *Circuit Judge*.  Susan Marantz sued her em-
ployer, the Permanente Medical Group, Inc. and the Life
Insurance Company of North America (LINA), claiming
that they violated the Employee Retirement Income

Securities Act (ERISA) by refusing to provide her with long-term disability payments as required under the employer's disability insurance plan. LINA denied that Dr. Marantz qualified for the benefits and the district court held that Dr. Marantz did not satisfy her burden of proving that in April 2005 she was entitled to long-term disability benefits under the terms of the policy. On appeal, we affirm the holding of the district court.

## I.

Before Susan Marantz became a patient visiting many back and pain specialists, she was herself the doctor. From 1996 to 1999, Dr. Marantz practiced pulmonary and critical care medicine at a Kaiser Permanente Hospital in California. Before she left that position in 1999, Dr. Marantz served as the chief of pulmonary and critical care medicine, and as assistant head of quality assurance and director of utilization. She performed procedures such as bronchoscopes and intubations, inserted arterial lines, and was standing for many hours at a time. In response to back pain, in 1997 Dr. Marantz underwent surgery to treat a herniated disc and degenerative disc disease, but the surgery did not eliminate her pain and, as of August 1999, she stopped working full time.

As a benefit of her employment with Kaiser Permanente, Dr. Marantz received disability insurance coverage from LINA. On October 13, 1999, Dr. Marantz filed a claim with LINA seeking long-term disability benefits, claiming that radiculopathy, pain, and paresthesia pre-

vented her from performing her duties as chief of pulmonary care. The policy under which she made the claim stated as follows:

> For purposes of coverage under the Policy, you are Disabled if, because of Injury or Sickness, you are unable to perform all the material duties of your regular occupation, or solely due to Injury or Sickness, you are unable to earn more than 80% of your Indexed Covered Earnings.

> After Disability Benefits have been payable for 60 months, you are Disabled if your Injury or Sickness makes you unable to perform all the material duties of any occupation for which you may reasonably become qualified based on education, training or experience, or solely due to Injury or Sickness, you are unable to earn more than 80% of your Indexed Covered Earnings.

(R. 75 at L1421). LINA approved the claim under the first paragraph above, and began paying benefits as of February 9, 2000. In July of that year, Dr. Marantz had another spinal surgery but her low back and leg pain continued. MRIs taken in early 2000 revealed degenerative disc disease and spinal stenosis. In December 2000, upon Marantz's request, LINA provided $26,000 in funding for Marantz to enroll in Johns Hopkins University's online Masters of Public Health program, so that she might retrain for a medical career that was less physically demanding.

In June 2001, Marantz moved to Chicago and began working approximately twenty hours per week for the

Illinois Department of Public Health as medical director of both the bureau of medical programs and the tuberculosis program. Her earnings allowed LINA to offset the disability benefits and reduce its monthly payment from $7,616 to approximately $5,000 per month. While working at the Department, Dr. Marantz completed eighty credit hours of course work and earned her master's degree in public health in 2004.

LINA paid Dr. Marantz's disability benefits for the sixty-month period beginning February 2000 under the definition of disability applicable to that period—that is, the first definition of disability recited above at page 3. During this period, LINA periodically asked Dr. Marantz's physicians to assess her condition. In March 2001, Kirk Pappas, M.D. stated that in an eight-hour day, Dr. Marantz could occasionally (up to 2.5 hours) sit, stand, walk, climb, and reach, and that she was a suitable candidate for rehabilitation. In September 2001, Joseph Skom, M.D. stated that Dr. Marantz could perform clerical, administrative, and sedentary work. In November 2003, Rochelle Parker, M.D. reported that Marantz's limitations were moderate and would not preclude sedentary work.

In August 2004, LINA began to investigate whether Dr. Marantz satisfied the policy's more stringent definition of disability which was to became relevant after the first sixty months of payments. That definition, set forth more fully in the second paragraph of the policy recited *supra* at page 3, states that a worker is disabled if he or she is unable to perform all the material duties *of any*

*occupation for which [that worker] may reasonably become qualified based on education, training or experience,* as opposed to an inability to perform "all the duties of [the worker's] *regular occupation*"—the definition of disability applicable in the first sixty months. To aid its inquiry, LINA obtained updated medical records from Dr. Marantz's treating physicians, and hired an investigative firm to perform video surveillance.

In January 2005, LINA asked Dr. Marantz to undergo a functional capacity evaluation to assess her current physical and functional abilities and her potential to return to work. Dr. Marantz's personal physician acknowledged at trial that she has ordered such evaluations and that they do indeed measure a person's strength, body mechanics, and cardiovascular function in relation to ability to work. (R. 134, Tr. 149:24-150:3).

Christie Burns, a licensed and registered occupational therapist at HealthSouth conducted the testing, which lasted approximately three to four hours over two consecutive days. During the tests, Dr. Marantz reported pain with certain movements and was unable to perform or complete certain tasks. For example, Dr. Marantz's lumbar extension was only three percent of normal. Ms. Burns testified that Dr. Marantz's complaints of pain and discomfort were consistent and not exaggerated. After completing the testing on April 4 and 5, 2005, Ms. Burns concluded that Dr. Marantz was capable of performing light work under the U.S. Department of Labor's classification system. Specifically, Ms. Burns concluded that Dr. Marantz was able

to sit for 5.5 hours or more and stand and walk for 2.5-5.5 hours. The ability to perform "light work" also indicated that Dr. Marantz could perform jobs in the less demanding category of "sedentary work."

Before and after the functional capacity evaluation testing, the investigative firm Photofax conducted surveillance of Dr. Marantz. The surveillance video shows Dr. Marantz running across a busy street in heeled boots; shopping at Home Depot, Neiman Marcus, Loehmann's, and Nordstrom Rack; lifting heavy items into her car; riding a stationary bike in a group exercise class at a health club; and, after the second day of the evaluation, shopping at a fur store and Petco. The investigators followed Dr. Marantz for five days, but only recorded activity on three of those days. Dr. Marantz testified that one of the surveillance days was unusual in that she was hosting a friend who was visiting Chicago from out-of-town.

Shortly after the functional capacity evaluation, LINA's medical director, Dr. Robert Manolakas, reviewed the results and agreed with the finding that Dr. Marantz could move from part-time work to full-time sedentary or light work. Dr. Manolakas never physically examined Dr. Marantz, but rather based his conclusions on the following factors: (1) Dr. Marantz was not, at that time, under the care of a physician for low back pain; (2) she was working part time; (3) she exercised extensively; (4) although an MRI showed stenosis and disc disease, her spine was stable and her neurological exam, strength reflexes, and sensation were normal; (4) there was no

documentation of neuromuscular atrophy in her lower extremities; and (5) her claims of debilitating pain were inconsistent with her use of weak analgesics.

A few days later, on April 21, 2005, the case manager from LINA, John Buchanan, faxed the functional capacity evaluation to Dr. Marantz' treating internist, Elizabeth Anderson, and then called her to discuss the findings. That same day Mr. Buchanan also sent a letter to Dr. Anderson summarizing their conversation. According to the letter, Dr. Anderson purportedly informed Dr. Manolakas that Dr. Marantz was physically capable of performing light demand work, meaning she could sit and stand or walk for six hours cumulatively in an eight-hour day, she could lift and carry up to twenty pounds for a maximum of one third of the day, and lift and carry ten pounds for up to two thirds of the day. The letter also stated that Dr. Marantz had no other restrictions, either postural or manipulative. Dr. Manolakas asked Dr. Anderson to amend any statements which she believed to be inaccurate and fax him a corrected version of the letter.

On that same day, Margie Munoz, M.S., C.R.C., conducted a transferrable skills analysis. The analysis compared Dr. Marantz's skills, training, and physical abilities documented in the functional capacity evaluation with the job requirements for different occupations set forth in the Department of Labor's Enhanced Dictionary of Occupational Titles to determine what jobs Dr. Marantz could perform. The analysis indicated that Dr. Marantz could perform the duties of a

pulmonary medicine physician, which was classified as a light duty occupation.

Again, on that same day, Mr. Buchanan notified Dr. Marantz that LINA was terminating her long-term disability benefits because, based on the results of the functional capacity evaluation, coupled with Dr. Anderson's and Dr. Manolakas' assessments, LINA had determined that she did not meet the more stringent definition of "disabled" applicable after the first sixty months of disability.

A few days later, on April 26, 2005, Dr. Marantz sent LINA a letter disputing the termination and arguing that Dr. Anderson had only certified her ability to work for four to six hours a day, which was not compatible with the practice of pulmonary medicine. She also included a report from Jeffrey Karasick, M.D., a neurosurgeon who had performed an independent medical exam in April 2002, and concluded that Dr. Marantz's decision to cease practicing pulmonary medicine was reasonable, despite the fact that she was capable of performing activities of daily living. Dr. Karasick reached this conclusion as part of an examination for a private disability insurer, Unum Provident, through which Dr. Marantz also received benefits. As part of Unum's investigation of Dr. Marantz's disability claim, two doctors, Dr. Karasick and Dr. Julie Wehner conducted independent medical exams in April 2002. Dr. Karasick concluded that Dr. Marantz was unable to perform her occupation as a pulmonologist, that her condition was permanent, and that additional therapy would be of

no use. Dr. Wehner came to the opposite conclusion, reporting that Dr. Marantz could return to her prior occupation as a pulmonary physician. Ultimately Unum Provident accepted the former conclusion and accepted liability on the claim.

The next day, Dr. Anderson faxed LINA an addendum to her April 21 letter, stating that Dr. Marantz was unable to bend at the waist for longer than a few seconds, and unable to work for more than four to six hours a day. When Dr. Manolakas telephoned Dr. Anderson a few days later, however, Dr. Anderson reported that the additional restrictions identified in her addendum were based on Dr. Marantz's report of her limitations and not on Dr. Anderson's own clinical assessment of the situation. During her deposition, Dr. Anderson maintained that Dr. Manolakas called her office after it had closed and that she may not have been entirely accurate as she was unable to look at Dr. Marantz's chart when they spoke. Dr. Anderson's position at the deposition was that other doctors had evaluated Dr. Marantz and that although she was able to sign the disability papers based on her assessments of these evaluations, she herself had not determined that Dr. Marantz was disabled. In forms submitted to RBC Insurance and Unum Provident, Dr. Anderson indicated that she had not released Dr. Marantz to work as a pulmonologist, but had released her to work in "any occupation." The exact meaning of this language is unclear.

In August 2005, Dr. Marantz's counsel appealed LINA's decision, attaching reports from John E. Sargent, M.S.,

CRC, a vocational expert, and Dr. Susan Keeshin, M.D., a physician board certified in physical and rehabilitation medicine. Sargent stated that Dr. Marantz could not work as a pulmonologist because she had limited ability to bend and was unable to work more than a six-hour day. Dr. Keeshin, who had been treating Dr. Marantz since May 2005, stated that Dr. Marantz could walk no farther than one city block, that she could not sit or stand for more than twenty minutes, that she could occasionally lift and carry less than ten pounds, and could never lift more than twenty pounds. She estimated that she would likely be absent from work more than four days per month. She based these assessments on Dr. Marantz's descriptions of her own pain, how it occurred, and how it was affecting her ability to perform, rather than on any specific medical test. Her estimate of absences was based on an assumption of work as a full-time pulmonologist. She did not estimate how much time off Dr. Marantz might need in a part-time sedentary position. On June 20, 2005, Dr. Keeshin prepared an "attending physician supplementary statement" for RBS Insurance in which she stated that Dr. Marantz was unable to work for more than twenty-five hours a week, and was able to perform a sedentary job. Dr. Keeshin testified at trial that she never evaluated whether Dr. Marantz could perform a full-time job in another field because she felt that her role was not to assess Dr. Marantz's functionality, but rather to assist her with pain management and increase her functionality.

Dr. Marantz's appeal also included a May 2005 MRI report and an electromyographic testing report. The

reports indicated that Marantz had several herniated discs, at least one of which had worsened since 2000, radiculitis, and scar tissue from the prior disc surgery. She also submitted a medical report from Dr. Keeshin that reiterated that Dr. Marantz had herniated discs, radiculitis, limited range of motion, chronic low back pain, pain with movement, a painful right sacroiliac joint, and an increasingly rounded back. Dr. Keeshin concluded that Dr. Marantz could not sit or stand for more than twenty minutes at a time, was limited to sitting, standing, or walking for less than two hours total in an eight-hour day, was limited to walking less than one city block, and could work only in a sedentary position, and not work for more than twenty-five hours per week. Dr. Keeshin testified that MRIs may not necessarily reflect functional ability and that she had patients with pathology on their MRIs that were working full time.

Dr. Marantz also submitted John Sargent's detailed vocational analysis which concluded that the medical findings would prevent Dr. Marantz from returning to work as a pulmonologist and that she would be unable to earn 80% of her pre-disability earnings in a part-time sedentary position.

In November 2005, while her appeal with LINA was pending, Dr. Marantz began working as the Director of the Suburban Cook County Tuberculosis Sanitarium, in which position she resumed clinical responsibilities, including examining patients. She worked about twenty hours per week, including taking calls by phone to

consult with nurses. During this time, she co-authored articles, gave speeches, and appeared before the Cook County Board of Commissioners.

In response to the appeal, LINA asked a certified rehabilitation counselor, Virginia Schmidt, M.S., to conduct a new transferrable skills analysis to determine whether Dr. Marantz could meet her wage replacement requirement in a sedentary position. Schmidt identified sedentary positions for which Dr. Marantz was qualified and calculated that her wage replacement requirement was $137,313.72 per year. Ms. Schmidt hired an outside consultant, Sue Howard, to conduct a labor market survey to determine whether Dr. Marantz could meet that salary requirement in a sedentary position not requiring patient care. Based on the consultant's research, Ms. Schmidt determined that Dr. Marantz was qualified for various sedentary positions including four specific open positions in the area with salaries that ranged from $130,000-$170,000. Ms. Howard believed that Dr. Marantz could command a salary at the high end of the ranges based on her extensive administrative experience and pay grade for her then current position.

On January 24, 2006, Gary Pearson of LINA sent Dr. Marantz's counsel a letter stating that LINA was affirming the termination of her long-term disability benefits based on the evidence which indicated that she was capable of earning more than 80% of her indexed covered earnings in a sedentary position. Mr. Pearson testified that he affirmed the termination decision based on the functional capacity evaluation, the labor market survey, the assessments of Dr. Manolakas, Dr. Anderson,

Dr. Keeshin, and Ms. Burns, and all the evidence in the record, including the surveillance videos, although he testified that he had not reviewed the updated MRI and EMG evidence.

Dr. Marantz filed suit under 29 U.S.C. § 1133, in the district court for the Central District of California, alleging that the termination of her benefits violated ERISA. After the case was transferred to the Northern District of Illinois, Judge Moran denied cross-motions for summary judgment and conducted a bench trial. Judge Moran died before rendering a judgment, and Chief Judge Holderman assumed responsibility for the case. Judge Holderman reviewed the trial record and then, on December 4, 2009, conducted a limited supplementary bench trial which included testimony by Dr. Marantz and oral argument from both sides' counsel. On December 21, 2009, Judge Holderman entered judgment in the defendants' favor, finding that Dr. Marantz had not satisfied her burden of proving that in April 2005 she was entitled to long-term disability benefits under the terms of the policy. Dr. Marantz claims the district court erred and thus we review that decision here.

## II.

A district court conducts a de novo review of a denial of benefits under an ERISA plan unless the plan documents grant the claim fiduciary discretionary authority to construe the policy terms to decide eligibility for benefits, which in this case it does not. *Ruttenberg v. U.S. Life Ins. Co.*, 413 F.3d 652, 659 (7th Cir.

2005). On appeal, we follow our ordinary standard of appellate review. We review the district court's findings of fact and application of law to those findings for clear error. *Integrated Genomics, Inc. v. Gerngross,* 636 F.3d 853, 863 (7th Cir. 2011). Dr. Marantz recognizes that this is the standard of review that would ordinarily apply, but urges this court to alter course based on the unusual circumstances of this case, that is, that the district court judge died after hearing the evidence but before issuing an opinion and the case was then reassigned to a different district court judge, Judge Holderman. Dr. Marantz argues that we should not grant the normal deference to the successor judge's findings of fact as he heard only one witness, and reviewed the rest of the evidence in the record on paper.

Under Federal Rule of Civil Procedure 63, upon request of any party, Judge Holderman was required to recall any witness whose testimony was material and disputed. Judge Holderman directed the parties to review the rule and report on whether any witnesses should be recalled, but both parties elected to stand on the transcripts. After reviewing the post-trial briefs, Judge Holderman *sua sponte* recalled Dr. Marantz, and heard her testimony for several hours, thus allowing him ample opportunity to assess the credibility of the primary witness. He also reviewed the transcripts and the exhibits from the earlier trial. Dr. Marantz agreed to allow the case to proceed on the transcripts alone and thus cannot now complain that the use of the transcripts along with several hours of Dr. Marantz's new testimony (which she did not request) was not sufficient to allow for clear error review.

In many ways, this situation is akin to that which occurs when a court reviews findings derived from stipulated facts, as the parties agreed to stand on the transcripts. Where the district court adopts a stipulated fact wholesale, an appellate court need review those facts only for clear error. *United States v. Firishchak*, 468 F.3d 1015, 1023 (7th Cir. 2006). *See also May v. Evansville-Vanderburgh Sch. Corp.*, 787 F.2d 1105, 1115-16 (7th Cir. 1986) (where parties agree to a judgment on stipulated facts, "[i]n effect the judge is asked to decide the case as if there had been a bench trial in which the evidence was the depositions and other materials gathered in pretrial discovery").

The standard of review that governs is therefore the one found in Fed. R. Civ. P. 52(a). As we would after a bench trial, we will review the district court's legal conclusions de novo and review any factual inferences the district court made from the stipulated record as well as its application of the law to the facts for clear error. *See Johnson v. West*, 218 F.3d 725, 729 (7th Cir. 2000); *Hess v. Hartford Life & Acc. Ins. Co.*, 274 F.3d 456, 461 (7th Cir. 2001).

Using this standard, we begin with a discussion of the surveillance video evidence, as it appears to be the evidence most highly disputed. Dr. Marantz condemned the surveillance video evidence on two grounds, noting first that it did not support LINA's determination, and second that it was impermissible for LINA to rely on it. Dr. Marantz argues that LINA did not claim that it had relied on the surveillance video until after the litigation commenced, in violation of what Dr. Marantz

claims is ERISA's prohibition of post-hoc rationalizations, citing 29 U.S.C. § 1133; 29 C.F.R. § 2560.503-1(g)(1)(i). It is far from clear that LINA violated ERISA by failing to mention the surveillance in the letter denying Dr. Marantz's administrative appeal. The ERISA statute Dr. Marantz cites, 29 U.S.C. § 1133, requires only that an employee benefit plan

> (1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and

> (2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

*Id.* It does not appear to require the plan to identify each and every piece of evidence that it relied upon in reaching its decision to deny benefits. Neither does the accompanying regulation Marantz cites which states,

> Except as provided in paragraph (g)(2) of this section, the plan administrator shall provide a claimant with written or electronic notification of any adverse benefit determination. . . . The notification shall set forth, in a manner calculated to be understood by the claimant—

>> (I) The specific reason or reasons for the adverse determination;

29 C.F.R. § 2560.503-1(g)(1)(i).

More importantly, a district court's judicial review of LINA's decision is de novo. The "de novo" review in this context, however, is different than de novo review as we ordinarily use the term in this court. In an ERISA case, the district court "must come to an independent decision on both the legal and factual issues that form the basis of the claim." *Diaz v. Prudential Ins. Co. of Am.*, 499 F.3d 640, 643 (7th Cir. 2007). That means that whether the plan administrator gave the employee a full and fair hearing or undertook a selective review of the evidence is irrelevant. In fact, "the district courts are not reviewing anything; they are making an independent decision about the employee's entitlement to benefits." *Id.* Under de novo review, therefore, the surveillance video would be proper evidence in the district court even if LINA had violated ERISA by failing to note the video in its decision letters. The district court's role was to make an independent decision about Dr. Marantz's entitlement to benefits, and therefore any procedural foibles LINA may have made are irrelevant on appeal. *Id*. In this context it is clear that the district court properly considered the surveillance video. The district court entered final judgment following a bench trial so its findings of fact must not be set aside unless clearly erroneous. *Cohen Dev. Co. v. JMJ Props., Inc.*, 317 F.3d 729, 735 (7th Cir. 2003).

Moreover, both LINA's appeals claim manager, Gary Pearson, and its medical director, Dr. Manolakas, testified without contradiction that they considered the surveillance video in reaching their decisions that Dr. Marantz could perform full-time work. Dr. Marantz's counsel

had the opportunity to review and respond to the videos prior to trial, as evidenced by her final appeal letter to LINA (R. 75 at L196).

Dr. Marantz also hopes to convince us that surveillance data is inherently unreliable. And to be sure, it does have its limitations. The cases Marantz cites in support of her position, however, note the specific instances in which surveillance data is unhelpful or unreliable without dismissing such evidence per se. *See, e.g., Mote v. Aetna Life Ins. Co.*, 502 F.3d 601, 609 (7th Cir. 2007); *Osbun v. Auburn Foundry, Inc.,* 293 F. Supp. 2d 863, 870 (N.D. Ind. 2003).[1] Surveillance evidence is of limited utility, the cases tell us, when the recorded data does not conflict with the applicant's self reports of limitations, or when the surveillance catches limited bursts of activity that might be anomalous. *See, e.g., Maher v. Mass. Gen. Hosp. Long Term Disability Plan*, 665 F.3d 289, 294-95 (1st Cir. 2011); *Osbun,* 293 F. Supp. 2d at 870. In other words, the weight given to surveillance evidence of this type depends both on the amount and nature of the activity observed. *See Maher*, 665 F.3d at 294-95. Thus the cases Marantz cites in order to discredit surveillance evidence

---

[1] Other cases the plaintiff cites for demonstrating that "numerous courts have thus rejected surveillance evidence for failing to depict the plaintiff's ability to perform employment on a continuous and reliable basis," have nothing to do with surveillance at all. (Marantz Brief at 32). *See, e.g., Hawkins v. First Union Corp. Long-Term Disability Plan,* 326 F.3d 914, 918 (7th Cir. 2003)*; Crespo v. Unum Life Ins. Co. of Am.,* 294 F. Supp. 2d 980, 996 (N.D. Ill. 2003).

do not help her much. For example, Marantz cites an unreported decision from the Northern District of California as an example of a case where the court held that video surveillance affected the claimant's credibility, but did not establish an ability to work on a full-time basis. *Finley v. Hartford Life and Acc. Ins. Co.*, No. C 06-06247 CW, 2009 WL 3517648 (N.D. Cal. Nov. 20, 2009). The Ninth Circuit, however, reversed on appeal finding that the ERISA plan administrator's termination of a plan participant's long-term disability benefits based on the surveillance video was not, in fact, an abuse of discretion. *Finley v. Hartford Life and Acc. Ins. Co.*, 400 Fed. Appx. 198, 2010 WL 4116636 (9th Cir. Oct. 19, 2010).[2]

Most recently Dr. Marantz has brought to our attention, through a supplemental filing, a case from the First Circuit which Dr. Marantz says addresses the question of the reliability of surveillance for determining entitlement to disability benefits. Dr. Marantz fails to note that the portion of the case to which she draws our attention is the dissent, but in any event, both the dissent and the majority seem to agree that where the evidence obtained during surveillance is not inconsistent with the claimant's own account of her activities, then it is of limited utility. *Maher*, 665 F.3d at 294-95. This conclusion is consistent with case law from this Circuit in which courts have approved of the use of surveillance when it is used in

---

[2] The case was reversed after the appellant filed her brief in chief, but before she filed her reply brief and before oral argument.

conjunction with other medical evidence and demonstrates an inconsistency between a claimant's actual abilities and demonstrated abilities. *See, e.g., Mote,* 502 F.3d at 609 (finding that the videotapes revealed the claimant engaging in many of the activities that she claimed to be unable to accomplish in her application for long-term disability benefits and stating, consequently, that the Plan properly considered them); *Dougherty v. Ind. Bell Tel. Co.,* 440 F.3d 910, 917-18 (7th Cir. 2006); *Shyman v. Unum Life Ins. Co.,* 427 F.3d 452, 456 (7th Cir. 2005); *Patterson v. Caterpillar, Inc.,* 70 F.3d 503, 505-06 (7th Cir. 1995).

In this case, Dr. Marantz's activity is in fact inconsistent with her report of her own abilities. Photofax conducted surveillance from Monday, November 29, to Friday, December 3, 2004, and from Saturday, April 2, to Wednesday, April 6, 2005. The surveillance covered ten days, approximately four months apart. According to Dr. Marantz, she is unable to work full time and when she arrives home from work she is exhausted. She also claims that if she works for more than four or five hours a day, she must increase her pain medication and needs a day to recuperate. Yet on December 1, for example, she left her home at 8:00 a.m., drove half an hour to the hospital, gave a presentation and left the hospital at noon. She then drove to a Costco near her home, purchased groceries which she then lifted from the bottom of the cart into the trunk of her car. In fact, the surveillance video shows her bending into her cart, twisting and lifting into the car nine times and then bending into the cart another eight times to gather items into a bag which then requires two hands and a big tug to maneuver

into the trunk. (R. 161, Ex. 11, 1 of 3 at 23:30 to 28:30).
Fifteen minutes later, the investigators filmed Dr. Marantz
leaving Petco and lifting an almost twenty-pound case
of dog food out of the cart and into her car, followed by
a seventeen-pound bag of dry dog food, and then
another heavy item that required two hands to lift. *Id.*
At the end of it all, she is seen heaving a heavy-looking
large black purse over her shoulder. *Id.* Next, she drove
to the post office, retrieved her mail and drove home,
arriving just before 2:00 p.m.—a full six-hour day filled
with work, driving, walking, pushing, bending, twisting,
and heavy lifting. The very next day, Dr. Marantz left
her home at 7:05 a.m., and drove to a hospital to give
another presentation, after which she drove to Woodfield
Mall where she shopped for several hours before re-
turning home just before 2:00 p.m. Rather than resting
after a full day on December first, Dr. Marantz spent
seven hours the next day working, sitting, walking,
standing, shopping, and driving without showing any
signs of pain or discomfort.

Despite two full days of activity, the next day, Decem-
ber 3, 2004, Marantz left her home at 7:30 a.m., drove to
downtown Chicago and worked at the Illinois Depart-
ment of Public Health for approximately four hours
and then met a friend for lunch at 1:00 p.m. She sat at a
table in the restaurant for about half an hour without
exhibiting signs of discomfort. After lunch, Dr. Marantz
drove her friend around Chicago until at least 3:00 p.m.
when the investigators lost track of her. The investigators
returned to her home by 3:30 and did not see her return

by the time they ended surveillance at 4:00 p.m. Through-out her more than eight-hour day, she carried a large black purse and exhibited no visible signs of pain or discomfort.

Surveillance resumed just before Dr. Marantz's func-tional capacity evaluation. Two days before the evalua-tion at which she claimed significant pain and difficulty moving, she left her home, went to the post office and then went shopping at Home Depot, Neiman Marcus, Loehmann's, and Nordstrom Rack, at one point jogging across the street wearing boots with heels. When she left Neiman Marcus, she was carrying two shopping bags and had a backpack strung over one shoulder.

The next day, the day before the functional capacity evaluation, Dr. Marantz attended an hour-long bicycle-based exercise class ("spin class"), pedaling a stationary bicycle, at times leaning forward and at times sitting up. On April 5, 2005, Dr. Marantz attended the second day of the functional capacity evaluation, during which she complained of increased pain, parasthesia in her feet and ankles (the feeling of "pins and needles"), and ac-cording to her own brief, was significantly limited in performing basic lifting, range of motion and posi-tional exercises. Nevertheless, after leaving the exam, Dr. Marantz went shopping at two very large stores—American Fur Mart and Petco.

In sum, on several occasions, after working at her part-time job, or spending several hours in rigorous physical testing, she is seen shopping, running errands, exercising, and loading and unloading shopping carts with heavy

items, despite claims that she is unable to bend, twist, and lift more than ten pounds and is exhausted after her part-time workdays. As the district court noted, this cannot be explained by a "good days/bad days" scenario. (R. 143 at 20). "Bending over and lifting almost twenty pounds of dog food cans is inconsistent behavior for someone who should be fearful of further exacerbating a back injury which is allegedly so severe it has prevented her from resuming full time employment" in a sedentary position. *Id.*

The shopping was not one isolated episode of activity, but a series of long days filled with lots of activity after Dr. Marantz had already put in her part-time hours at work or in testing. *C.f. Maher*, 665 F.3d at 294 (noting that the brief periods of slightly more vigorous activity may have been isolated examples on a "good day.") The video shows numerous activities during parts of the day that Marantz claims she is unable to work. From it, the district court inferred that Dr. Marantz was neither fatigued nor in pain as a result of light work activity of sitting, driving, standing, walking, and lifting items that weighed up to fifteen to twenty pounds. (R. 143 at 18). The district court properly noted that the surveillance evidence by itself was not dispositive, but that it did impact Marantz's credibility and was probative evidence of her functional limitations. *Id.* at 19-20. Not only was the surveillance video relevant because it contradicted Marantz's self reports, but the district court also considered it within the proper context of the other evidence.

That other evidence was plentiful and heavily relied upon both by LINA and then the district court. Thus Marantz's citation to *Osbun* from the Northern District of Indiana falls flat, for in *Osbun* the sole evidence the plan administrator had to justify its termination of benefits was the surveillance video. *Osbun*, 293 F. Supp. 2d at 869-70. In this case, however, the surveillance video was but one small portion of evidence upon which LINA and the district court relied to make its determination.

Indeed, more than the surveillance, LINA relied on the results of the April 2005 functional capacity evaluation. A functional capacity examination consists of a battery of tests to assess a patient's current physical and functional abilities and potential to return to work. Dr. Marantz challenges the reliability of functional capacity evaluations as a whole, but the cases she cites (most of which are district court opinions, and all of which are from outside of this Circuit) have grievances with specific aspects of the evaluation that are not necessarily at issue in this case. Some lasted a mere three hours, or failed to assess the effect of pain, or had equivocal results. *See, e.g., Michael v. Am. Int'l Group, Inc.*, No. 4:05CV02400 ERW, 2008 WL 4279582, at *18 (E.D. Mo. Sept. 15, 2008); *Stup v. Unum Life Ins. Co. of Am.*, 390 F.3d 301, 309-10 (5th Cir. 2004); in others a one-day evaluation was completely inconsistent with the diagnosis of the physician who had been treating

the claimant over a long term.[3] *See, e.g., Edgerton v. CNA Ins. Co.*, 215 F. Supp. 2d 541, 550-51 (E.D. Pa. 2002).

Dr. Marantz concedes that this Circuit finds utility in functional capacity evaluations when the testing factors reports of pain into the functional assessment, as the evaluator did in this case. *See Leger v. Tribune Co. Long Term Disability Ben. Plan*, 557 F.3d 823, 835 (7th Cir. 2009). This court evaluates the helpfulness of functional capacity evaluations based on the individual circum-stances of the assessment—for example, whether the results are consistent or conflicting with other medical examinations; whether the evaluation took into account reports of pain during and after testing; and whether the test assessed ability over time rather than at one particular moment. *See id.; see also Holmstrom v. Metro. Life Ins. Co.*, 615 F.3d 758, 770-71 (7th Cir. 2010) (a functional capacity evaluation that included twenty different detailed tests, and repeated testing again on a second day constituted a thorough functional capacity evaluation that should not have been ignored by the insurer).

In this case, the occupational therapist evaluated Dr. Marantz for approximately three-and-a-half hours on the first day and two-and-a-half hours on the second

---

[3] Another case cited by Dr. Marantz was vacated in 2003. *Ballinger v. Eaton Corp.*, 212 F. Supp. 2d 1086 (S.D. Iowa Aug. 5, 2002), *vacated*, No. 1-00-CV-90075, 2003 WL 22339247 (S.D. Iowa May 6, 2003). It thus has no precedential force. *Van Straaten v. Shell Oil Prods. Co.*, No. 11-8031, 2012 WL 1340111, *4 (7th Cir. 2012)

day. The therapist evaluated Dr. Marantz not only through testing, but also by observing her positioning and ability to sit throughout the examination and intake interviews. At trial, the therapist thoroughly described the various tests she performed and explained that she took into account both Dr. Marantz's inability to complete certain tests and her complaints of pain. In the end, the results of the functional capacity evaluation indicated that Dr. Marantz had the ability to sit for more than 5.5 hours per day, and to stand and walk between 2.5 to 5.5 hours per day and thus could perform sedentary work, or even light duty work in a full-time capacity. Dr. Manolakas reviewed the functional capacity evaluation and determined that the occupational therapist's findings were consistent with the medical data in Dr. Marantz's claim file.

Dr. Marantz did not offer a rebuttal functional capacity evaluation, but rather offered the testimony of a certified rehabilitation counselor, John Sargent, who testified that the occupational therapist's findings in the evaluation were unreasonable. Sargent testified that the results of the testing indicated that Dr. Marantz is not capable of performing full-time, sedentary work. Dr. Marantz's own treating physician testified, however, that in her opinion, only occupational therapists, physical therapists, and medical doctors are qualified to administer or comment on functional capacity evaluations. Mr. Sargent is not an occupational therapist and has never personally administered such an evaluation. The district court did not err by failing to accord much weight to his testimony.

Dr. Marantz criticizes functional capacity evaluations as being unreliable and unable to determine an individual's capacity to work an eight-hour day on a regular and continuous basis and cites, for support, an article in the journal "Physical Therapy." The article, however, notes that such evaluations can indeed be used to project abilities over a forty-hour work week when measurements such as heart rate and blood pressure are monitored during testing and analyzed as part of the assessment. Phyllis M King, *A Critical Review of Functional Capacity Evaluations*, 78 Physical Therapy 852, 862, 863 (1998). And, in fact, the occupational therapist conducting Dr. Marantz's evaluation testified that she monitored Dr. Marantz's heart rate and blood pressure throughout the testing. (R. 124 at 287).

Finally, Dr. Marantz criticizes the conclusions that the occupational therapist drew from the objective test results. For example, Dr. Marantz states that her lumbar flexation and left lateral extension were reported at 48-52% and 61-63% of normal on both days, respectively, but fails to tell us why these particular numbers contradict the conclusion that she can engage in sedentary or light work. The district court did not clearly err by taking into account the results of the functional capacity evaluation in assessing whether Dr. Marantz was entitled to benefits.

When a functional capacity evaluation conflicts with the treating physician's conclusion, the court must decide which evidence to credit. It is not clear in this case, however, that there was any meaningful conflict between

the results of the functional capacity evaluation and the treating physicians' conclusions. Dr. Anderson, for example, treated Dr. Marantz from September 2004 to May 2005. She completed the disability forms, but indicated that although Dr. Marantz could not work as a pulmonologist, she could perform other work. At trial she backed further away from this determination, saying that she "wasn't really the person that made her disability; go back and review to the people [sic] who actually did create her disability." (R. 167, Ex. 17 at 37). Furthermore, Dr. Anderson stated that she had made her disability determination based on other people's evaluations and Dr. Marantz's self-complaints, although in her testimony she does note that, upon physical examination, she noticed signs that Dr. Marantz was favoring her back in a way that indicated pain.[4] Moreover, in her addendum to Dr. Manolakas' April 21, 2005 letter, Dr. Anderson recognized that Dr. Marantz could work from four to six hours a day, or up to thirty hours per week—not a far stretch from full-time work.

---

[4] Dr. Marantz's brief cites Pl.'s Ex. 17 at pp. 11, 50 for this last observation. Neither page contains any testimony about observations of back pain. This court, through its diligence, was able to find a statement about pain observation at page 49 of this exhibit. Plaintiff repeats the error again at page 23 of her brief and page 15 of the reply brief. The myriad citations errors by both parties have bogged down this court and wasted time and resources. See also footnote 5, *infra*. *Harvey v. Town of Merrillville,* 649 F.3d 526, 529 (7th Cir. 2011) (citations that do not actually support the propositions they purport to render our jobs more difficult than they ought to be.)

But even if Dr. Anderson's findings contradicted the evidence in the record, the district court certainly did not err by weighing the evidence and concluding that Dr. Marantz was capable of working full time. For example, in response to a letter from Dr. Manolakas, Dr. Anderson wrote that Dr. Marantz could not bend at the waist for more than a few minutes. The surveillance video, however, shows Dr. Marantz bending into her shopping carts and her car on many occasions within the course of one day and across many days, and without hesitation or visible signs of discomfort. The district court was well within its discretion to accord less weight to Dr. Anderson's opinion in light of the video evidence.

The district court judge also considered the testimony of Dr. Keeshin, who began treating Dr. Marantz in May 2005, after the functional capacity evaluation and shortly after LINA notified Dr. Marantz that it was terminating her benefits. Dr. Keeshin's May 23, 2005 report noted that Dr. Marantz was unable to sit or stand for any significant amount of time and was unable to return to work as a pulmonologist. On June 7, 2005, Dr. Keeshin completed a Lumbar Spine Residual Functional Capacity Questionnaire in which she reported that Dr. Marantz was limited to walking one city block without pain and could not sit or stand for more than twenty minutes. Dr. Keeshin also found that Dr. Marantz could occasionally lift and carry less than ten pounds, rarely lift and carry ten pounds, and never lift and carry twenty pounds. She estimated that Dr. Marantz

would likely be absent from work more than four days per month. Finally, on June 20, 2005, Dr. Keeshin prepared an Attending Physician Supplementary Statement for another insurer, RBC Insurance, in which she stated that Dr. Marantz was unable to work more than twenty-five hours a week, and only in a sedentary position.

In her testimony during the bench trial, Dr. Keeshin explained that the purpose of her visits with Dr. Marantz was to assist the latter with pain management and functionality and to improve Dr. Marantz's quality of life, not to assess her ability to perform in a full-time occupation. Consequently, many of her conclusions, although supported by an MRI and EMG, were based on Dr. Marantz's own descriptions of her capabilities and pain levels.[5] She did not perform particular tests to determine whether Dr. Marantz's assessments were accurate. In fact, she testified that the functional limitations she noted in the Lumbar Spine Residual Functional Capacity Questionnaire were based on what

_____

[5] Dr. Marantz argues that Dr. Keeshin considered objective evidence in making her assessments, with citations to the Record at 135, pp. 156, 184, 191. See Marantz Brief at 14. Yet again, no such reference exists at these cites. Once more, through a time-consuming search, the court was able to find some of the references in the record at 134. These references, however, only confirm that the bulk of Dr. Keeshin's assessment was based on Dr. Marantz's own description of her abilities and symptoms. This error is repeated in the reply brief at page 9.

Dr. Marantz reported during the interview. As a result, she never performed any tests that would have assessed whether Dr. Marantz could return to a full-time job with fewer physical demands than that of a pulmonologist. She had no opinion as to whether Dr. Marantz could work for longer hours in a sedentary position. And although she estimated that Dr. Marantz would miss four days of work per month as a pulmonologist, she admitted that she did not address whether she would have as many absences if working in a sedentary position. Dr. Keeshin considered Dr. Marantz's MRI and EMG results which identified nerve impairment, worsening disc herniation, and scar tissue from her surgeries. At the same time, however, Dr. Keeshin emphasized that MRI's do not necessarily reflect a person's functional restrictions or limitations.

Some of the limitations that Dr. Keeshin noted conflicted with other evidence in the record, including from Dr. Marantz herself. For example, Dr. Keeshin wrote that Dr. Marantz could not walk more than a block, yet Dr. Marantz told the functional capacity evaluator that after work she walked a half mile from the train to her house. And in a disability questionnaire that Dr. Marantz completed in August 2004, she wrote that she was walking half a mile four times per week. Dr. Marantz claimed that the discrepancy was due to a deteriorating condition, yet Dr. Anderson testified that Dr. Marantz's condition did not change during this period.

Dr. Keeshin also wrote that Dr. Marantz had pain when bending forward or with any static forward flexed

position, and that she could never lift and carry twenty pounds. The surveillance video, however, reveals many instances of Dr. Marantz bending into her car and shopping carts without hesitation, and shows her easily lifting a twenty-pound case of canned dog food and a seventeen-pound bag of dry dog food out of her shopping cart and into the back of her car. In addition, Dr. Keeshin reported that Dr. Marantz could sit no more than twenty minutes at a time, but Dr. Marantz reported to Ms. Burns that she could sit up to sixty minutes at a time. The district court carefully considered the conflicting evidence and again was within its discretion to find that many of Dr. Keeshin's conclusion were undermined by the information upon which she relied or by other evidence in the record.

Dr. Marantz faults LINA for failing to have a medical professional review the EMG testing and MRI performed in May 2005. Drs. Keeshin and Anderson, however, both testified that Dr. Marantz's functionality and medical conditions did not change in 2005. Thus her medical condition and functionality were the same at the time of the functional capacity evaluation as they were when the MRI and EMG were conducted. Furthermore, as Dr. Keeshin testified, MRI's do not necessarily reflect a person's functional restrictions or limitations.

Marantz also criticizes the review by LINA's medical director, Dr. Robert Manolakas. Dr. Manolakas did not examine Dr. Marantz, but did review her medical file, a procedure accepted by this court. *Davis v. Unum Life Ins. Co. of Am.*, 444 F.3d 569, 577 (7th Cir. 2006). Dr.

Marantz argues that Dr. Manolakas based his opinion on the mistaken impression that the record contained no examinations showing significantly decreased range of motion in the lumbar spine, when the functional capacity evaluation showed just that. She also objected to Dr. Manolakas' statement that she was using only weak analgesics when there was testimony that she was taking the narcotic-based medications Ultram and Vicodin twice a day. Finally, Dr. Marantz argues that Dr. Manolakas' report incorrectly concluded that she was not under a doctor's care for back pain when she was seeing her internist, Dr. Anderson for her back pain. We need not address the details of each of these criticisms other than to note that Dr. Manolakas reviewed the medical evidence, interviewed Dr. Anderson, and was thus able to render adequately an expert opinion without a direct examination. To the extent there were any misstatements or misconceptions in Dr. Manolakas' report, they were not sufficient to render the district court's reliance on his opinion clear error. The district court concluded that Dr. Manolakas reviewed the functional capacity evaluation and determined that the findings were consistent with medical data in Dr. Marantz's file.

In a brief aside, the district court noted that "in addition to all the evidence in the record," the court observed Dr. Marantz during the trial and noted "that she was able to sit for extended periods of time without signs of discomfort and both lifted and maneuvered heavy exhibit binders without hesitation or apparent discomfort." (R. 143 at 26). The court noted that it was

concerned only with her abilities at the time LINA termi-nated her benefits, but considered it as one factor given Dr. Marantz's testimony that her condition had not im-proved since that time. Dr. Marantz objected to what it called the district court's "sit and squirm test," but as the district court judge indicated, this was but a small factor in his consideration of all of the evidence. More-over, this court has always held that a fact finder can use observation to assist in making credibility determina-tions. *Powers v. Apfel*, 207 F.3d 431, 436 (7th Cir. 2000) (upholding hearing officer's credibility determination where hearing officer considered claimant's statement that she could not sit for more than ten minutes without severe pain to be inconsistent with his observation of her during the hearing, at which she sat for far longer than ten minutes without apparent signs of discomfort).

Having concluded that Dr. Marantz could perform full-time sedentary work, the district court looked to see whether Dr. Marantz was unable to earn eighty percent of her indexed covered earnings as required for coverage under the policy.

In November 2005, while her appeal with LINA was pending, Dr. Marantz began working approximately twenty hours per week as the director of the Suburban Cook County Tuberculosis Sanitarium, a job which in-cluded some clinical responsibilities, including exam-ining patients. Some of Marantz's time was spent "on call," consulting with nurses about patient care by telephone.

After receiving Dr. Marantz's appeal, LINA retained a rehabilitation counselor, Sue Howard, to perform a labor market survey to determine whether Dr. Marantz could meet her wage replacement requirement in a sedentary position—that is, whether she was capable of earning more than 80% of her indexed covered earnings, $11,442.81 per month or $137,313.72 per year. Ms. Howard designed the questions that her employee, Larry Howard, asked potential employers. Dr. Marantz argues that Ms. Howard was not sufficiently versed in Dr. Marantz's qualifications and that she did not know whether Dr. Marantz had the necessary qualifications for the identified jobs. Although it is true that Ms. Howard did not review Dr. Marantz's curriculum vitae until later, she testified that the skills listed on Dr. Marantz's CV were those she assumed when conducting the survey. Specifically, Mr. Howard told employers that Dr. Marantz had experience as the chief of pulmonary critical care, that she had been chief of utilization, and director of respiratory medicine, and that she was a medical consultant and public health physician, an instructor in clinical medicine, and an attending physician with a recently obtained master's degree in public health. (R. 122, at 366). Mr. Howard asked each employer about the physical demands of the job, the salary, and whether Dr. Marantz would be qualified for the position. *Id.* Based on the information Ms. Howard received, she concluded that Dr. Marantz was qualified for several positions including: (1) medical director of a mobile X-ray company with a salary of $175,000 per year; (2) full-time medical director at the Illinois Department of Public

Health, with a salary of $130,000 or more; or (3) medical director at Advocate Healthcare, with a salary of $130,000-$170,000 per year. Ms. Howard believed that Dr. Marantz would receive a salary at the upper end of some of these ranges because she had extensive administrative experience and currently commanded a salary toward the upper end of those ranges.

Dr. Marantz countered Ms. Howard's conclusions about job availability by again presenting the testimony of her vocational specialist, John Sargent. Mr. Sargent testified that Dr. Marantz could not earn eighty percent of her indexed covered earnings on either a full-time or part-time basis. The district court rejected his conclusion in favor of Ms. Howard's, as Mr. Sargent had not contacted any of the employers in Ms. Howard's reports to dispute her findings. We will not disturb the district court's factual findings after it has weighed the evidence on both sides unless, after considering all of the evidence, this court is left with the definite and firm conviction that a mistake has been made. *See United States v. Rice*, 673 F.3d 537 (7th Cir. 2012). We are not.

There is also much debate about what Dr. Marantz could earn if her part-time position was converted to a full-time position. In fact, Dr. Marantz acknowledged that the full-time salary for her current position in October 2008 was $174,000 per year. (R. 123, Tr. 75:21-76:6). Despite this admission, Dr. Marantz argues in her brief that the district court erred in calculating her hypothetical full-time salary at the Illinois Department of Public Health in 2005 to be $138,320. The district court arrived at this

number by doubling Dr. Marantz's then current half-time salary of $69,160. Marantz, however, argues that her bi-weekly salary of $2,660 actually reflects a twenty-one hour work week, and thus when one calculates her salary at this rate, her full-time salary would be only $131,733.33 thus missing the 80% requirement by about $5,580. Dr. Marantz submitted the testimony of John Sargent, a certified rehabilitation counselor who calculated her salary in this manner.

To summarize, Dr. Marantz is only entitled to payments if she cannot earn at least 80% of her indexed covered earnings or $137,313. Whether Dr. Marantz would be slightly above or below this number in a full-time position with her current employer depends on whether her current salary reflects twenty or twenty-one hours of work per week. After considering all of the evidence before it, the district court concluded that Dr. Marantz's full-time annual wage at the Illinois Department of Public Health would be approximately $138,000. We see no reason to upset this finding on appeal.

Dr. Marantz also argues that Cook County allows her to alter her schedule and work location to accommodate her symptoms, allowing her to continue her work in her part-time position, although there was no discussion below as to whether such accommodations would be available were she to work in her same position but on a full-time basis. The district court noted that Dr. Marantz bore the burden of proving that she was not capable of making an adjustment to her daily routine. (R. 143 at 29).

In sum, the district court concluded that Dr. Marantz had not satisfied her burden of proving that in April 2005 she was entitled to long term benefits under the terms of LINA's policy—a decision which, on appeal, we affirm.