**John DOE**

v.

**UNUM LIFE INSURANCE COMPANY OF AMERICA and Unum Group.**

**Civil Action No. 12–11413–RWZ.**

United States District Court, D. Massachusetts.

Signed Aug. 8, 2014.

Mala M. Rafik, Sarah E. Burns, Rosenfeld Rafik & Sullivan, P.C., Boston, MA, for John Doe.

Courtney D. Cruz, Joan O. Vorster Mirick O'Connell Demallie & Lougee, Worcester, MA, for Unum Life Insurance Company of America and Unum Group.

## MEMORANDUM OF DECISION

ZOBEL, District Judge.

Plaintiff John Doe [1] ("Doe") filed this action against defendants Unum Life Insurance Company of America and Unum Group ("Unum"). He contends that Unum arbitrarily and capriciously denied him long-term disability ("LTD") benefits in violation of the Employment Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001–1461.[2] Now pending are the parties' cross-motions for summary judgment (Docket ## 60, 63). For the following reasons, both motions are DENIED and the case is REMANDED to Unum.

## I. Background

### A. Plan Language

Doe participated in an employee benefits plan ("the Plan") which included LTD benefits. The relevant Plan language states,

You are disabled when Unum determines that:

—you are limited from performing the material and substantial duties of your regular occupation due to your sickness and injury, and

—you have a 20% or more loss in your indexed monthly earnings due to the same sickness or injury[.]

After 24 months of payments, you are disabled when Unum determines that due to the same sickness or injury, you are unable to perform the duties of any gainful occupation for which you are reasonably fitted by education, training or experience[.]

Administrative Record [3] ("AR") 375 (emphasis removed). A "regular occupation" is "the occupation you are routinely performing when your disability begins." *Id.* 402. A "gainful occupation" is one that "is or can be expected to provide you with an income within 12 months of your return to work, that exceeds: 80% of your indexed monthly earnings, if you are working, or 60% of your indexed monthly earnings, if you are not working." *Id.* 399.

The Plan limits lifetime cumulative benefits for disabilities due to mental illness to 24 months. *Id.* 383. If an individual has exhausted the two years of mental illness-related payments, he or she may continue to received LTD benefits only if he or she is disabled due to physical illness. *Id.* 966.

### B. Doe's Claim

In 2004, Doe was diagnosed as HIV-positive after complaining of diarrhea and fatigue to his doctor. *Id.* 1966. After his diagnosis, Doe continued to work as a

---

1. Due to the sensitive nature of the issues in this case, neither the parties nor I use plaintiff's real name.

2. The Complaint also includes a count for attorneys' fees. *See* 29 U.S.C. § 1132(g)(1).

3. The nearly 4,000 page Administrative Record is replete with duplicates, triplicates, and worse. In some places, the Record is logically out of order and nowhere is there any guide to its contents. The parties not infrequently cite pages that do not support the proposition for which they are cited. The court should not have to waste time ferreting out the relevant pieces from a jumbled mess of documents to resolve the case. The parties are reminded to present the Record in an organized, useful way.

partner in a large accounting firm. In April 2007, Doe attempted suicide by inserting a large amount of crystal methamphetamine into his rectum. *Id.* 200–01. After he recovered in the hospital, he attended a residential treatment program in northern California for nearly three months. *Id.* 51. Doe sought and received a leave of absence from work during this time. *Id.* 109–110.

Doe applied for LTD benefits. In its review of his application, Unum noted that Doe was primarily unable to work due to the side effects of his drug abuse, paranoia, and anxiety, especially around computers and other technology. *Id.* 524. On March 25, 2008, Unum approved his request. *Id.* 561. The letter alerted Doe to the 24–month maximum payment period for disability due to mental illness. *Id.* 563. In June 2008, Doe attempted suicide again by overdosing on Ativan pills. *Id.* 727.

On October 16, 2009, Doe exhausted the 24–month benefit period. He applied for continued benefits due to physical illness. Unum made payments under a reservation of rights while it investigated Doe's claim. *Id.* 2918. Its investigation shows the following.

### C. Doe's Physicians

Doe received primary treatment from Dr. Kevin Kapila, an infectious disease expert and internist, and from Dr. Douglas Horst, a gastroenterologist.

#### 1. Dr. Kevin Kapila

Kapila became Doe's primary care physician in January 2009. *Id.* 3695. In a February 12, 2009, office visit, Kapila noted that Doe experienced "some fatigue." *Id.* 2147. In a March 23, 2009 follow-up, Kapila documented Doe's "continued problems with GI upset presenting as diarhea [sic] which was his main complaint when he was [diagnosed] with HIV." *Id.* 2144.

On April 27, 2009, Kapila noted that Doe's diarrhea continued. *Id.* 2140. He also suffered a herpes outbreak and was prescribed medication. *Id.* The next month, Kapila noted that Doe reported a "[p]roblem with controlling his bowels ... [and he] has had accidents when he goes out. He has a lot of cramping prior to the episodes. [He is] [c]areful with his diet, [and] cannot think of a food that triggers it.... Ever[y] [bowel movement] is loose and urgent." *Id.* 2127. He further noted that Doe's "[f]atigue is present, severe at times." *Id.* The fatigue had "escalated since the beginning of the year." *Id.* The fatigue did not have a clear etiology from the lab tests, but could have been related to Doe's diarrhea, mood, or the effect of crystal meth relapses on his body. *Id.* 2129. When he saw Doe in September, Kapila recorded that Doe had a

> recurrence of diahrea [sic] over the weekend[.] ... He has had multiple loose and watery [bowel movements] over the weekend[;] also does not feel food is digested[;] seeing undigested food[.] This has been keeping him up at night and his fatigue is much worse[.] He is having some muscle cramps[.] IF [sic] he tries to eat this will trigger nausea[.]

*Id.* 2327.

The follow-up visits continued, as did Doe's physical symptoms. In December 2009, Kapila noted that "[d]iarhea [sic] is still [Doe's] main complaint ... [and it] is causing some isolation[;] [he is] no [sic] able to go out due to fears of having and actually having fecal accidents." *Id.* 3265. His fatigue was "much worse with increase [sic] diarhea [sic]." *Id.* The next month, Kapila recorded that Doe's gastrointestinal biopsies were negative, but his diarrhea still persisted. *Id.* 3252. He wrote, "basically the way [Doe] deals [with it is] that

he does not eat[;] if he eats then he has to go, having accidents if he does not plan[;] limits function." *Id.* His fatigue remained. Doe "sleeps up to 14 hours in a day." *Id.* Kapila stated that Doe "[s]till has a severe level of impairment and can not work." *Id.* The diarrhea and fatigue continued through 2010. *Id.* 3423, 3228–30, 3207, 3194, 3635–36, 3626.

In December 2010, Kapila wrote a letter regarding Doe's condition to Doe's attorney. *Id.* 3695. In it, he stated that Doe has been taking Atripla, a combination antiretroviral HIV medication. *Id.* He mentioned that he referred Doe to Dr. Horst for treatment of his "diarhea [sic] which has been severe, resulting in fecal incontinence," for which Doe had taken Imodium and probiotics. *Id.* Kapila noted that diarrhea is a common symptom of HIV-positive individuals, and may be caused by Atripla, antidepressants, or HIV itself. *Id.* Doe's fatigue was also "severe." *Id.* Kapila concluded,

> I do not believe that [Doe] is malingering or obtaining secondary gain from his current condition. He has been very compliant with his treatment and has been proactive in finding any ways to resolve his symptoms. [Doe] currently would not be able to hold a job based on the current symptoms he is having[.]

*Id.*

### 2. Dr. Douglas Horst

In a letter to Dr. Kapila dated November 4, 2009, Horst wrote that Doe "has had two years of diarrhea, consisting of three or four daily stools of loose or watery consistency, associated with urgency and occasionally with incontinence. He wears protective underwear to avoid social inconvenience." *Id.* 2568. He noted that Doe's CBC, lymphocyte count, and nutritional parameters were normal. *Id.* A stool sample collected in May 2009 showed the presence of several parasites, but follow-up samples were negative. *Id.* Horst recommended additional evaluation. *Id.* 2570.

### D. Unum's Consultants
#### 1. Dr. Tony Smith

Unum obtained its first doctoral consultation from Dr. Tony Smith, a physician certified in family medicine. Smith reviewed the records and noted that Doe's stool studies in early 2009 showed evidence of parasites in the lower gastrointestinal tract, but appropriate medication was prescribed. Id. 2788. His recent stool studies were negative. *Id.* His colonoscopy did not reveal any potential causes of the diarrhea Doe reported. *Id.* His viral load was undetectable and his CD4 count was normal. *Id.* Based on these factors, Smith concluded, "I can find no lab etiology, diagnostic study evidence, or clinical evidence supporting the reported diarrhea or fatigue.... The current medical data in the file supports no specific work restrictions from a general medical standpoint." *Id.*

#### 2. Dr. Gary Greenhood

Following Smith's review, Unum asked Dr. Gary Greenhood to review the records in Doe's file. *Id.* 2833. Greenhood is board certified in internal medicine and infectious diseases. *Id.* 2841. Greenhood concluded that although Doe had diarrhea, the medical documentation in his file did not support restrictions or limitations based on physical illness. *Id.* 2836. He so concluded for four reasons. First, Doe's 2008 attending physician statements did not mention HIV infection or diarrhea. *Id.* 2834. Second, the cause of the diarrhea could not be identified. *Id.* 2836. Upper and lower endoscopies revealed nothing. *Id.* There was no evidence of dysfunction of the anal sphincter. *Id.* And Doe's weight remained relatively stable. *Id.* Third, Doe reported activities in a field interview that are inconsistent with his

claimed physical limitations. He took monthly trips to New York as an automobile passenger and took one trip to France. *Id.* Finally, the record showed no impairment with regard to HIV itself. *Id.*

### 3. Dr. Michael Silverman

Unum recommended that an independent medical examiner ("IME") perform a "whole person review of [Doe's] physical status." *Id.* 2841. The IME, Dr. Silverman, an infectious disease specialist, answered two questions posed by Dr. Greenhood:

1. Does the submitted medical information, absent consideration of the reported diarrhea and excluding consideration of any behavioral health conditions, support that infection with HIV or its treatment limits or restricts [Doe] from any specific work activity or from less than full-time work (40 hours per week)? If so, please explain.

2. Does the submitted information support that [Doe's] idiopathic diarrhea (reported with no definitive etiology) and alleged fecal incontinence, taken in context with the activities he reported during a field service interview performed in November of 2009, limit or restrict him from any specific work activity or work hours? If so, please explain.

*Id.* 2886–87. Silverman produced a nine-page report but devoted only a single paragraph to responding to each question. The first he answered in the negative. Doe's weight was normal and he had no gastrointestinal issues. *Id.* 2887. Silverman stated that Doe "does not appear" to have been treated with medications for his diarrhea. *Id.* For these reasons, Silverman concluded that Doe had no work restrictions, but "[i]t would be advisable to have the claimant's office placed near a bathroom for close access for possible

emergencies." *Id.* He also answered the second question in the negative, concluding that Doe's diarrhea posed no work limitations. *Id.* He recommended "a trial with medications" and "further stool studies" to treat Doe's diarrhea. *Id.*

### 4. Catherine Rogers, Vocational Rehabilitation Consultant

Unum engaged Catherine Rogers to perform an occupational analysis to determine whether the material and substantial duties of Doe's occupation exceeded the limitations its doctors had outlined. She noted that most accountants work forty hours per week in a typical office setting. *Id.* 2900. She continued, "[t]ravel is noted as a material and substantial duty of the occupation however would be able to be accommodated by scheduling and would not increase physical demands." *Id.* 2900–01. She concluded that the demands of Doe's job did not exceed any physician-identified limitations. *Id.* 2901.

### E. Denial and Appeal

Unum terminated payment of Doe's LTD benefits on March 31, 2010. *Id.* 2917. It did not request repayment of the benefits it had paid under the reservation of rights. *Id.* 2918. Doe appealed the denial on September 23, 2010. *Id.* 2998–99. He submitted additional medical evidence, as well as evidence that he had begun pursuing a degree in music composition at the Boston Conservatory under a schedule which accommodated his limitations. *Id.* 3731. Unum asked a fourth doctor to review the file. Dr. Liana Rodela concluded that Doe's reports of fatigue and diarrhea "are in excess of clinical findings and inconsistent with his activities." *Id.* 3755. Unum upheld its termination of LTD benefits by letter dated February 18, 2011. *Id.* 3758–63. Having exhausted his

appeals under the Plan, Doe filed suit. *See* 29 U.S.C. §§ 1132(a)(1)(B), (e)(1).

## II. Legal Standard

■ In ERISA cases, "where review is based only on the administrative record before the plan administrator and there is an ultimate conclusion as to disability to be drawn from the facts, summary judgment is simply a vehicle for deciding the issue." *Orndorf v. Paul Revere Life Ins. Co.*, 404 F.3d 510, 517 (1st Cir.2005). Consequently, "the nonmoving party is not entitled to the usual inferences in its favor." *Id.*

■ The Plan gives Unum the discretionary authority to determine benefit eligibility:

> In exercising its discretionary powers under the Plan, the Plan Administrator, and any designee (which shall include Unum as a claims fiduciary) will have the broadest discretion permissible under ERISA and any other applicable laws, and its decisions will constitute final review of your claim by the Plan. Benefits under this Plan will be paid only if the Plan Administrator or its designee (including Unum) decides in its discretion that the applicant is entitled to them.

AR 398; *see Stephan v. Unum Life Ins. Co. of Am.*, 697 F.3d 917, 924 n. 1 (9th Cir.2012) (concluding identical language grants discretionary authority); *Wakkinen v. UNUM Life Ins. Co. of Am.*, 531 F.3d 575, 581 (8th Cir.2008) (same). When the plan administrator has such discretion, I must uphold its decision unless it is "arbitrary, capricious, or an abuse of discretion." *Doyle v. Paul Revere Life Ins. Co.*, 144 F.3d 181, 183 (1st Cir.1998) (quotation and citation omitted). My task is to inquire "whether the aggregate evidence, viewed in the light most favorable to the non-moving party, could support a rational determination that the plan administrator

acted arbitrarily in denying the claim for benefits." *Leahy v. Raytheon Co.*, 315 F.3d 11, 18 (1st Cir.2002). In short, the plan administrator's determinations "must be reasonable." *Colby v. Union Sec. Ins. Co. & Mgmt. Co. for Merrimack Assocs. Long Term Disability Plan*, 705 F.3d 58, 62 (1st Cir.2013). Ultimately, I "determine lawfulness by taking account of several different, often case-specific, factors, reaching a result by weighing all together." *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 117, 128 S.Ct. 2343, 171 L.Ed.2d 299 (2008). The existence of contrary evidence does not make a decision arbitrary. *Gannon v. Metro. Life Ins. Co.*, 360 F.3d 211, 213 (1st Cir.2004). At the same time, my review "is just that-a review and not a rubber stamp." *Lopes v. Metro. Life Ins. Co.*, 332 F.3d 1, 5 (1st Cir.2003) (quotation and citation omitted); *see Conkright v. Frommert*, 559 U.S. 506, 521, 130 S.Ct. 1640, 176 L.Ed.2d 469 (2010) ("Applying a deferential standard of review does not mean that the plan administrator will prevail on the merits.").

■ My review must consider the existence of a conflict of interest on the part of the administrator. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). If the administrator possesses a conflict of interest, I may afford its determination less deference, or none at all. *Leahy*, 315 F.3d at 16. "[A] conflict exists whenever a plan administrator, whether an employer or an insurer, is in the position of both adjudicating claims and paying awarded benefits." *Denmark v. Liberty Life Assurance Co. of Bos.*, 566 F.3d 1, 7 (1st Cir.2009). But the First Circuit has concluded that "the fact that the plan administrator will have to pay the plaintiff's claim out of its own assets does not change the arbitrary and capricious standard of review." *Wright v. R.R. Donnelley & Sons*

*Grp. Benefits Plan,* 402 F.3d 67, 75 (1st Cir.2005) (quotation, citation, and alterations omitted). Thus, although the structural conflict is one factor I may consider, *see Glenn,* 554 U.S. at 117, 128 S.Ct. 2343, the legal standard remains the same.

## III. Analysis

Doe contends that Unum's termination of LTD benefits was arbitrary and capricious because Unum did not adhere to the terms of the Plan in two significant ways. First, Unum failed to consider relevant evidence. Specifically, it ignored substantial evidence of Doe's fatigue and fecal incontinence, two of his disabling symptoms, and focused instead—and only—on diarrhea. It also failed to tailor its analysis of Doe's capabilities to his high-stress job setting. Second, Unum improperly weighed the evidence it did consider. It overlooked the consistency between its surveillance footage and Doe's self-reported symptoms, and it exaggerated the extent to which Doe's occasional leisure travel qualifies him to return to his demanding job.

A brief return to the Plan language helps place the analysis in the proper context. Because Unum had made 24 months of payments, the relevant Plan language states that Doe is disabled if he is "unable to perform the duties of any gainful occupation for which [he is] reasonably fitted." AR 375. And because Doe was not working when he filed his claim, a "gainful occupation" is one that will, within 12 months on the job, pay at least 60% of Doe's indexed monthly earnings. *Id.* 399. At the time he stopped working, Doe was a

partner in a global accounting firm and earned $1,026,872 per year, or $85,572.67 per month.[4] The question, then, is not whether Doe can perform any job. The question is whether Doe can perform the duties of a job which will pay him $51,343.60 (sixty percent of $85,572.67) per month, or $616,123.22 per year, indexed for inflation. I consider the arguments with this benchmark in mind.

### A. Failure to Consider Relevant Evidence

### 1. Fatigue and Fecal Incontinence

 A plan administrator may not simply ignore medical or vocational evidence which contradicts its conclusion. *Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 834, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003); *Petrone v. Long Term Disability Income Plan for Choices Eligible Emps. of Johnson & Johnson & Affiliated Cos.,* 935 F.Supp.2d 278, 293 (D.Mass.2013). More specifically, "[a]n administrator's failure to address all relevant diagnoses in terminating a claimant's benefits is ... a cause for concern that suggests the decision may have been arbitrary and capricious." *Miller v. Am. Airlines, Inc.,* 632 F.3d 837, 853 (3d Cir.2011); *Kalish v. Liberty Mut./Liberty Life Assurance Co. of Bos.,* 419 F.3d 501, 510–11 (6th Cir.2005).

 There is no doubt that Dr. Kapila documented a persistent history of debilitating fatigue. In fact, he noted it during at least twelve of Doe's office visits. AR 2148 (February 12, 2009: "SOme [sic] fatigue, but can be related to change in sleep

4. Doe lists a slightly different figure—$1,029,032. Pl.'s Mem. in Supp. of Mot. for Summ. J., Docket # 64, at 2. His citation to the record in support of that figure does not in fact list the figure or provide any hint as to where he obtained it. The figure I use comes from a letter from Doe's employer granting him a leave of absence. AR 31. It explains that his base salary in Fiscal Year ("FY") 2007 was $900,000. Doe's employer averaged the bonus Doe received in FY 2005 and FY 2006 to arrive at his expected bonus for FY 2007—$126,872.

cycle"); *id.* 2145 (March 23, 2009: "[c]om-plains of . . . fatigue"); *id.* 2127 (May 18, 2009: fatigue "severe at times," "has esca-lated since the beginning of the year"); *id.* 2166 (June 15, 2009: "Fatigue is still pres-ent, but not as bad"); *id.* 2336 (August 6, 2009: "Fatigue is still a [sic] issue for the client, less the time of day, more a [sic] issue with a limited amount of energy, and also the heat makes it worse."); *id.* 2327 (September 21, 2009: "fatigue is much worse"); *id.* 3265 (December 4, 2009: "Fatigue is much worse with increase [sic] diarhea [sic]"); *id.* 3252 (January 28, 2010: "Fatigue still a problem. Sleeps up to 14 hours in a day needs to rest. Still has severe level of impairment and can not work."); *id.* 3246 (February 25, 2010: "Fatigue . . . is still a problem, part may be related to GI issues, also this is a problem with HIV in general"); *id.* 3228 (June 3, 2010: "Fatigue is still a major problems [sic] has to parcel out his ener-gy."); *id.* 3207 (July 22, 2010: "Still struggling with fatigue and concentra-tion"); *id.* 3194 (September 20, 2010: "En-ergy level with school, there issome [sic] feeling run down. He is trying to manage work load with rest, likes the work, but still physically run down.").

So too with fecal incontinence, which Kapila documented at least twelve times. *Id.* 2144 (March 23, 2009: "still has some periods where he has accidents"); *id.* 2168 (May 18, 2009: "Problem with con-trolling his bowels, has had accidents when he goes out. He has a lot of cramping prior to the episodes. . . . Ever[y] [bowel movement is loose and urgent.]"); *id.* 2332 (September 10, 2009: "Continues to have diarhea [sic], now with alternating consti-pation[.] [T]he problem is fecal urgency and incontinance [sic] [.]"); *id.* 2618 (No-vember 12, 2009: "explosive diarhea [sic] which does limit mobility"); *id.* 3265 (De-cember 14, 2009: diarrhea "causing some isolation, no [sic] able to go out due to

fears of having and actually having fecal accidents"); *id.* 3252 (January 28, 2010: "if he eats then [he] has to go, having accidents if he does not plan, limits func-tion"); *id.* 3246 (February 25, 2010: "Diarhea [sic]—still limiting activity. There are two problems, one is that he can not go too far from the house for fear of loss of bowel controll [sic] which has hap-pened. The other is the fatigue occurs when symptosm [sic] are aggravated."); *id.* 3243 (April 1, 2010: "He is still having urgency."); *id.* 3232 (April 29, 2010: "GI symptoms persist and are [sic] the diarhea [sic] is still somewhat limitting [sic] to his level of activity."); *id.* 3220 (July 8, 2010: GI issues "still limitting [sic] how far away from home he goes"); *id.* 3200 (August 26, 2010: "Urgency is a little bit better."); *id.* 3194 (September 20, 2010: "some per-sistant [sic] GI problems. He is [sic] al-most had two accidents with loosing [sic] bowel controll [sic], this limits client."). Indeed, Unum itself acknowledged Doe's fecal incontinence during its own "field visit" at Doe's attorney's office:

> The Insured continued talking about bowel issues indicating what makes him "insecure" is that "I don't have a lot of notice." There will often be "urgency" and if he is not near a bathroom he can have an accident. For example, yester-day, he literally had to run back to his house and up the stairs secondary to urgency problems relative to the need to get to his bathroom "and there was a minor accident." He did not expect this to happen as he had a bowel movement before he left his home. He had not worn a diaper outside because of this and indicated he was only going to be out for an hour. He then stated, "I've had full blown accidents before outside my house, inside my car." He will gen-erally wear a diaper if he is not going to

be near the house or if he is going to be out for a longer period of time. *Id.* 2444.

Unum's reviewers paid little or no attention to this well-documented history in their reports. Smith stated that he could find no lab etiology or clinical evidence supporting the reported fatigue. *Id.* 2788. Greenhood acknowledged that he had read Kapila's and Horst's office notes, *id.* 2833, but did not mention fatigue in his opinion. Although he did state that Doe suffered from "occasional fecal incontinence," *id.* 2836, he did not elaborate, dwelling instead on the etiology of Doe's diarrhea. Silverman, who devoted six pages of his nine-page report to merely listing the documents he reviewed, offered one conclusory paragraph to each review question. *Id.* 2880–88. He did not discuss fatigue or fecal incontinence. Rogers's vocational analysis relied on the opinions of Unum's three reviewing physicians. *Id.* 2900–01. Rodela, like the other physicians, likewise focused on the inability to identify a cause for Doe's conditions. *Id.* 3755.

■■■■ Unum, of course, owes no special deference to Kapila's and Horst's opinions as treating physicians. *Nord,* 538 U.S. at 825, 123 S.Ct. 1965. I also. recognize that I am not entitled to second guess the reviewing physicians' judgments about how much weight should be afforded to particular pieces of medical evidence. *Gannon,* 360 F.3d at 214. But this case is not about giving insufficient weight to acknowledged conditions; it is about failing to acknowledge those conditions in the first place. Despite nearly two years of notes from treating physicians detailing unremitting fatigue and fecal incontinence, Unum's physicians chose to either cursorily reference that evidence or ignore it altogether. "Engag[ing] with only that evidence which supports [the administrator's] conclusion" is not meaningful review.[5] *Petrone,* 935 F.Supp.2d at 293 (citing *Winkler v. Metro. Life Ins. Co.,* 170 Fed.Appx. 167, 168 (2d Cir.2006) ("An administrator . . . may not . . . cherry-pick the evidence it prefers while ignoring significant evidence to the contrary.")); *Love v. Nat'l City Corp. Welfare Benefits Plan,* 574 F.3d 392, 397–98 (7th Cir.2009); *DeLisle v. Sun Life Assurance Co. of Can.,* 558 F.3d 440, 447 (6th Cir. 2009) (holding denial of benefits arbitrary and capricious because none of the plan administrator's reviewers "confront[ed]" the medical conditions documented by treating physician). Unum did not fully and reasonably consider the evidence of Doe's physical condition. This failure counsels in favor of finding its decision arbitrary and capricious.

### 2. Job Setting

Unum obtained a job description[6] and spoke with Doe's former employer about

---

5. Unum physicians' reliance on the lack of a precise etiology for Doe's conditions is not a persuasive reason to deny LTD benefits. First, nothing in the Plan language requires Doe to establish the cause of his conditions to qualify for benefits. *See* 29 U.S.C. § 1104(a)(1)(D) (stating an ERISA fiduciary shall discharge its duties "in accordance with the documents and instruments governing the plan"). Second, it is unclear why etiology matters when some of Unum's physicians acknowledged that Doe does, in fact, have the conditions of which he complains. *See, e.g.,*

AR 2836 (Greenhood, stating "[s]ubmitted information supports that the claimant has diarrhea and occasional fecal incontinence."). Unum's physicians make no effort to explain why, when otherwise qualifying physical conditions are present, their inexact origin somehow enables Doe to work.

6. The job description Unum used was for "Level 9: Director," not for a partner. Written across the top of the description in the record is, "No job description for partners but this is just below so not much difference."

his duties. AR 2214. Doe worked a "stressful" job. *Id.* 2215. As a partner at a global firm, he supervised more than five hundred people at all times and hired and fired employees. *Id.* Much of his job involved "desk work," but Doe traveled frequently to client sites to maintain relationships and supervise junior auditors' and accountants' work. *Id.* 2214–17. Unum's vocational review states, "[t]ravel is noted as a material and substantial duty of the occupation however would be able to be accommodated by scheduling and would not increase physical demands." *Id.* 2900–01. Unum does not elaborate on this rather bald conclusion. Indeed, Unum makes no attempt to analyze how Doe's conditions affect his ability to perform any of his substantial executive responsibilities. Instead, it seizes on the sedentary nature of his work and merely recommends that his office be placed near a restroom. *Id.* 2901 (directing bulk of analysis to explaining Occupational Safety and Health Administration standards for toilet facilities).

 "[I]t is essential that any rational decision to terminate disability benefits under an own-occupation plan consider whether the claimant can actually perform the specific job requirements of a position." *Miller*, 632 F.3d at 855; *Conrad v. Reliance Standard Life Ins. Co.*, 292 F.Supp.2d 233, 240 (D.Mass.2003) (concluding plan administrator's denial of benefits was unreasonable because "its vocational experts only examined whether [claimant] was capable of doing sedentary work, and did not examine his ability to do any specific tasks required by the job [he] held"). The job description Unum used requires, among other things, the following of a partner:

- "Possesses people development and delegation skills, including training/instruction

- Possesses executive presence-needs to be able to be primary contact for the client, prepare and present presentations to clients and potential clients

- Possesses excellent risk management decision-making skills

- Supervises and reviews work of others, motivates team"

AR 508. These are demanding requirements. Yet Unum's vocational analysis is "a mere recitation of medical technology employed by various physicians ... without any reasoning as to why those diagnoses would permit [Doe] to function in the workplace." *Elliott v. Metro. Life Ins. Co.*, 473 F.3d 613, 619 (6th Cir.2006). That is not enough. Nor is its flimsy recommendation that Doe should have a restroom near his office. In short, Unum did not meaningfully reconcile Doe's medical condition with his stressful daily professional activities. Its perfunctory conclusion suggests that its review was arbitrary and capricious. *See Miller*, 632 F.3d at 854.

**B. Failure to Properly Weigh Evidence**

**1. Surveillance Activity**

Unum hired G4S Compliance & Investigations to conduct five consecutive days of surveillance on Doe from October 28, 2009 through November 1, 2009. AR 2537–53. On two days, Doe left his house to attend a one-hour piano lesson. *Id.* 2537–38. On a third day, he rode as a passenger in a vehicle for an undetermined period of time because the investigator lost him in traffic. *Id.* 2539. In sum, the evidence shows that Doe left his home for a short time on three days. At all other times, he remained inside.

AR 508. Doe does not contend that the duties in the description are inaccurate.

According to Doe, this evidence confirms his self-reported symptoms of fatigue and physically limiting fecal incontinence. Mem. in Supp. at 19. Unum responds that "the surveillance provides no meaningful information on which to evaluate Plaintiff's claim for LTD benefits," and therefore, it "did not rely upon or emphasize the video surveillance" in its denial of Doe's claim. Mem. in Opp. to Pl.'s Mot. for Summ. J., Docket # 73, at 14.

Only one of Unum's doctors—Dr. Silverman—acknowledged the surveillance. He dismissed it because it contained "little in the way of significant footage" and "no apparent episodes of diarrheal illness." AR 2886. Unum appears to believe the surveillance footage is relevant only if it outright confirms Doe's self-reported symptoms. Not so. "[T]he weight given to surveillance in these sorts of cases depends both on the *amount* and *nature* of the activity observed." *Maher v. Mass. Gen. Hosp. Long Term Disability Plan*, 665 F.3d 289, 295 (1st Cir.2011). Unum observed a five-day pattern of limited activity. True enough, this pattern may not amount to objective proof of Doe's condition. And it may be debatable how much weight to give this footage, but it is clear that Unum must give it at least *some* weight. *See Gross v. Sun Life Assurance Co. of Can.*, 734 F.3d 1, 27 (1st Cir.2013) (vacating and remanding for, *inter alia*, failing to make a contextualized assessment of surveillance footage).

And indeed, the evidence does appear to support Doe's claimed lifestyle as generally housebound with limited departures, his piano lessons and single car ride notwithstanding. *Id.* at 26 (stating limited physical activity "could be dismissed as day-to-day variations in physical ability related to fluctuations in [claimant's] level of fatigue and the timing of pain medications"); *Maher*, 665 F.3d at 294 (noting that short periods of activity may simply mean that claimant was having a " 'good day' "); *Cook v. Liberty Life Assurance Co. of Bos.*, 320 F.3d 11, 15, 23 (1st Cir.2003) (concluding evidence that claimant showed real estate on two Sundays was "so thin and outdated" that the plan administrator could not reasonably rely on it as a basis for denying benefits). The supportive footage, unacknowledged by Unum, is another weight on the scale in favor of arbitrary and capricious review.

## 2. Recreational Travel

In his field interview, Doe disclosed that he took trips to France, North Carolina, and the Berkshires in 2009. AR 2450. He also stated that he travels to New York "about once a month" to visit his family. *Id.* 2449. Doe's partner drives to and from Boston on these occasions. *Id.* Unum's doctors cited these trips as a reason why Doe could return to his old job. Dr. Greenhood wrote, "[i]f the claimant is able to complete such travel during which he is required to sit three to six hours, it is curious that it is alleged he is unable to sit in a work place during which he would have the ability to visit a bathroom when he feels the urge to defecate." *Id.* 2836. Dr. Silverman "noted that the claimant did travel on several trips to both New York City and France without apparent complications or reference to significant adverse events." *Id.* 2886. And Dr. Rodela concluded that Doe's "functional capacity is demonstrated by his ability to travel." *Id.* 3755.

Of course, occasional travel is not the same as working a demanding day job. Doe also noted that his partner accompanied him and cared for him on these trips, which would not occur if he returned to work. *Id.* 2449–50. To be sure, Doe's ability to ride in a car or airplane hints at his ability to perform occasional sedentary activity. But to equate occasional travel

with an intense professional setting indicates the same lack of contextualized understanding of Doe's health and work. And that failure to consider the evidence in its proper context suggests arbitrary and capricious review.

### C. Summary

The plan administrator is obligated to fairly assess the medical and vocational evidence. *See Nord,* 538 U.S. at 834, 123 S.Ct. 1965. Here though, Unum (1) failed to consider, despite consistent documentation from Doe's treating physicians, the effect of Doe's fatigue and fecal incontinence on his ability to work; (2) failed to analyze Doe's ability to do the specific tasks his job requires; (3) did not acknowledge the extent to which the surveillance footage supported Doe's self-reported symptoms; and (4) conflated Doe's occasional travel with his ability to work a demanding job. In short, the record shows that Unum ignored or minimized facts favorable to Doe while emphasizing facts unfavorable to his case. Its decision to terminate Doe's benefits was not the product of reasonable decisionmaking and substantial evidence. It was arbitrary and capricious.

### D. Remedy

 I have considerable discretion to select the remedy in an ERISA case. *Buffonge v. Prudential Ins. Co. of Am.,* 426 F.3d 20, 31 (1st Cir.2005). Once I determine, as I have here, that the plan administrator has acted arbitrarily and capriciously in denying benefits, I may award benefits or remand the case to the administrator for a more thorough evaluation. *Cook,* 320 F.3d at 24. The circumstances of the case dictate the proper remedy. *Colby,* 705 F.3d at 68.

 The Plan language requires Unum to determine whether Doe may work "any

gainful occupation for which [he is] reasonably fitted." AR 375. Unum concluded that Doe could work his old job as a partner at a global accounting firm. I have now held that its conclusion is wrong. But it remains to be seen whether plaintiff can work any other gainful occupation. Thus, the problem is not—at least not yet—that Doe was denied benefits to which he was entitled. The problem is that Unum did not complete the inquiry for which the Plan language calls. In this circumstance, it is appropriate to remand the case to the plan administrator to determine whether Doe can work "any gainful occupation" which will pay him $51,343.60 monthly, or $616,123.22 annually, indexed for inflation. *See Buffonge,* 426 F.3d at 31–32.

## IV. Conclusion

The parties' cross-motions for summary judgment (Docket # 60, 63) are DENIED and the case is REMANDED to Unum, which shall complete the review described within 90 days of this order. In default thereof, Doe's motion for summary judgment will be allowed and judgment shall enter accordingly. I reserve on the question of attorneys' fees.